Filed 9/14/20  P. v. Bray CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E071787 |
| v. | (Super.Ct.No. FWV18001821) |
| DOUGLAS RICHARD BRAY, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Michael A. Knish, Judge.  Affirmed with instructions.

Patricia L. Brisbois, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Kelley Johnson, Deputy Attorneys General, for Plaintiff and Respondent.

## I. INTRODUCTION

Douglas Richard Bray (defendant) was convicted by a jury of two counts of sexual penetration with a child age 10 or younger (Pen. Code,[1] § 288.7, subd. (b), counts 1 & 6); two counts of oral copulation with a child age 10 or younger (§ 288.7, subd. (b), counts 2 & 15); six counts of lewd acts against a child under age 14 (§ 288, subd. (a), counts 4, 5, 8, 10, 12 & 14); one count of a forcible lewd act against a child under age 14 (§ 288, subd. (b)(1), count 13); and one count of showing pornography to a minor (§ 288.2, subd. (a)(2), count 3). He was sentenced to consecutive terms of 15 years to life for each of the offenses involving sexual penetration and oral copulation (§ 288.7, subd. (b), counts 1, 2, 6 & 15); a consecutive term of eight years for the forcible lewd act conviction (§ 288, subd. (b)(1), count 13); a consecutive term of eight months on the conviction for showing harmful material to a minor (§ 288.2, subd. (a)(2), count 3); and consecutive two-year terms for each of the remaining convictions for lewd acts against a child (§ 288, subd. (a), counts 4, 5, 8, 10, 12 & 14), representing a total sentence of 20 years eight months plus an additional 60 years to life in state prison. Additionally, the trial court credited defendant's sentence with 337 days of presentence custody credit and imposed a $5,000 restitution fine; a $480 court operations assessment; and $360 in criminal conviction assessments.

Defendant appeals arguing: (1) the trial court may have erred in failing to release sealed psychiatric and medical records pertaining to the victim (Jane Doe), which might

---

[1] Undesignated statutory references are to the Penal Code.

have assisted in cross-examination; (2) the trial court erred in instructing the jury pursuant to CALCRIM No. 361 regarding a testifying defendant's failure to explain or deny allegations; (3) his constitutional rights were violated when the trial court imposed various fines and fees without conducting a hearing on his ability to pay pursuant to *People v. Dueñas* (2019) 30 Cal.App.5th 1157; and (4) the trial court's mathematical error in awarding him custody credits must be corrected. We order the trial court to correct the abstract of judgment to reflect an additional two days of presentence custody credit, for a total of 339 rather than 337 days, but otherwise affirm the judgment.

## II. FACTS AND PROCEDURAL HISTORY

### A. *Facts and Charges*

Defendant and his wife, E.B., were married in 1990 and have six biological children together. E.B. ran a daycare center from the first story of their family home. Jane Doe was enrolled in E.B.'s daycare and when Jane Doe was approximately two years of age, defendant and E.B. became her legal guardians. Over time, defendant's four older children moved out of the family home and by 2016, only Jane Doe and two other children lived with defendant and E.B.

On February 6, 2018, Jane Doe told E.B. that defendant had inappropriately touched her. The next day, E.B. contacted Jane Doe's social worker, San Bernardino County Children and Family Services (CFS), and the child abuse hotline to report Jane Doe's allegations of abuse. Following E.B.'s report of suspected abuse, Jane Doe was interviewed at school by law enforcement personnel and a social worker. During the

3

interview, she reported three incidents of abuse.[2] Jane Doe was also subsequently interviewed by a forensic interviewer at the county children's assessment center on February 9, 2018, and a sheriff's department detective on February 13, 2018. She disclosed additional incidents of sexual abuse in these interviews.

Defendant was arrested and charged with three counts of sexual penetration with a child age 10 or younger (§ 288.7, subd. (b), counts 1, 6 & 9); three counts of oral copulation with a child age 10 or younger (§ 288.7, subd. (b), counts 2, 11 & 15); one count of sexual intercourse with a child age 10 years or younger (§ 288.7, subd. (a), count 7); six counts of lewd acts against a child under age 14 (§ 288, subd. (a), counts 4, 5, 8, 10, 12 & 14); one count of a forcible lewd act against a child under age 14 (§ 288, subd. (b)(1), count 13); and one count of showing pornography to a minor (§ 288.2, subd. (a)(2), count 3).

*B. Relevant Evidence at Trial*

*1. Testimony of E.B.*

E.B. testified that when she and defendant first took Jane Doe into their home, he treated Jane Doe the same as any of their other biological children. Around the time that Jane Doe was six years old, E.B. began noticing changes in defendant's relationship with Jane Doe. Defendant stopped disciplining Jane Doe and prevented E.B. from disciplining

---

[2] The first involved defendant pulling down her pants and touching her vagina with his hand and his penis; the second involved defendant taking off his pants in front of her as she fell asleep; and the third involved defendant taking off both his pants and Jane Doe's pants, touching Jane Doe's breasts, and rubbing his penis until a "goopy" substance came out.

4

or correcting Jane Doe. Defendant did this despite continuing to discipline his other children and encouraging E.B. to discipline their other children more strictly.

During this same time period, defendant began taking Jane Doe with him alone to places outside the home. He would occasionally take Jane Doe hiking on Mount Baldy alone with him. Defendant would also take Jane Doe on shopping trips where he would buy Jane Doe nice gifts. Defendant would buy gifts for Jane Doe once or twice a month even though their other children would only receive comparable gifts on special occasions such as Christmas or birthdays.

E.B. would occasionally find defendant in Jane Doe's room after she had already put Jane Doe to bed. During these occasions, E.B. would typically find defendant sitting with Jane Doe on Jane Doe's lofted bed showing Jane Doe things on his phone. E.B. would confront defendant about keeping Jane Doe up, take his cell phone and leave the room. Sometimes defendant would immediately leave with E.B. and other times defendant would continue to linger in Jane Doe's room for up to 45 minutes. This was behavior that defendant never displayed with any of their other six children. E.B. did not believe the door to Jane Doe's room was ever closed during these incidents.

E.B. sometimes also noticed defendant alone with Jane Doe in their master bedroom or one of the guest bedrooms. On most of these occasions, the doors to these rooms would be shut and on some occasions, the doors would also be locked. She assumed the doors were shut to drown out noise from the daycare operating in their home. The times E.B. was able to walk into the rooms, she recalled finding defendant and Jane Doe on the bed watching things on defendant's cell phone. On some occasions,

5

Jane Doe would appear to jump away to the opposite side of the bed from where defendant was sitting.

E.B. testified that in the period between December 2016 and February of 2018, defendant began sleeping in an upstairs guest bedroom of their home instead of their shared master bedroom. Her sexual relationship with defendant was "nonexistent" and defendant complained it was because E.B. was too fat and sex with E.B. was not enjoyable.

E.B. testified that she became aware of an activity known as "tickle time" between defendant and Jane Doe approximately two or three weeks prior to Jane Doe's reports of abuse, but was unaware of such activity prior to that time. She was first alerted about "tickle time" by one of her daycare workers and only then began to notice that defendant and Jane Doe would engage in "tickle time" whenever defendant came home from work. Jane Doe would greet defendant at the door, jump up onto defendant, and both would eventually end up on the living room couch with Jane Doe either straddling defendant or laying across his lap. She witnessed defendant tickle Jane Doe in these positions and his hands would sometimes be over Jane Doe's clothing and other times slip underneath Jane Doe's clothing.

2. *Testimony of Defendant's Doctor*

Defendant's primary care physician was called to testify as a witness. He had a medical appointment with defendant on February 9, 2018. At the time, defendant complained he was under stress, had trouble sleeping, and had been arrested a few days prior. Unprompted, defendant disclosed that he had been arrested for lewd acts with his

daughter, opined that he was going to jail, and admitted that he had masturbated in front of his daughter. The physician specifically recalled defendant stating, "I'm going to jail. I—I did everything." The physician responded that defendant did not need to talk about the matter with him, but instead should speak with a lawyer. Following defendant's medical appointment, the physician contacted the San Bernardino County Sheriff's Department regarding defendant's statements in order to comply with his obligations as a mandated reporter.

*3. Jane Doe's Testimony*

Jane Doe was nine years old at the time she testified. Jane Doe explained she and defendant would engage in an activity called "tickle time" where defendant would tickle her on her belly and chest. "Tickle time" would only happen in the master or guest bedrooms; and involved defendant tickling her both over and under her clothing.

Jane Doe also testified defendant would rub her "private" or vagina; did so both under and over her clothes; did so "a lot"; and made her feel "awkward and weird." She recounted how defendant would rub her private with a massager in the master bedroom; used the massager both on top of and under her clothes; and used his fingers to put lubricating jelly on her. She described the massager as giving her sharp pains inside of her private and stated that defendant would cover her mouth when she tried to scream.

Jane Doe also testified appellant put his mouth on her private and licked it on more than one occasion. She stated that on one occasion while hiking with defendant, defendant made her get on her knees, pushed her head towards his penis, and made her put it in her mouth. He did this on a second occasion in the guest bedroom of their home.

7

Jane Doe also testified that at some point defendant began putting his penis inside of her private. She stated he did this "a lot" and it made her feel weird and gave her sharp pains. She described clear, white goopy stuff coming out of defendant's penis that defendant would use a paper towel to wipe off.

Jane Doe stated that appellant often tried to kiss her. When doing so, he would attempt to put his tongue in her mouth, but she would resist. If she tried to pull away, defendant would forcibly grab her and squeeze her cheeks together to force her mouth open.

Finally, Jane Doe stated that defendant would often show her pornography on his cell phone. She specifically described a Web site called "Beeg.com" which he would show her.

On cross-examination, Jane Doe admitted she often sees dead people who are not really there; that sometimes these people would look like defendant; and that these imaginary people tell her to kill herself, hurt others or say things to other people. She was inconsistent regarding when she began having these visions, stating both that they occurred prior to her disclosure of abuse and also only after defendant left their home.

*4. Testimony of L.B.*

One of defendant's other children also testified. L.B. was 16 years old at the time he testified and lived in defendant's home at the same time as Jane Doe. L.B. testified that Jane Doe was "all over my dad all the time"; that defendant would spoil Jane Doe with gifts; that defendant would spend more time with Jane Doe than he spent with any of the other siblings; and that defendant prevented anyone in the home from disciplining

8

Jane Doe. L.B. personally observed "tickle time" between defendant and Jane Doe both in the living room and in various bedrooms. He would observe defendant's hand reach under Jane Doe's clothing and touch Jane Doe's bare skin "a lot" and it would make L.B. feel uncomfortable. While "tickle time" would sometimes be initiated by Jane Doe, L.B. also recalled instances in which defendant specifically called out for Jane Doe in order to initiate "tickle time."

*5. Testimony of Detective*

A detective for the San Bernardino County Sheriff's Department testified she was the lead investigator assigned to defendant's case. She had been personally involved with investigating over 100 cases in the crimes against children unit of the department. The detective explained that persons who commit sexual crimes against children often display grooming behaviors, which are subtle acts intended to build bonds and trust with a child, such as treating the child well, buying the child gifts, and refraining from discipline.

She was present for and observed Jane Doe's forensic interview at the county children's assessment center and participated in a subsequent interview with Jane Doe at the sheriff's department headquarters. The detective also participated in an interview with defendant. The detective testified that defendant requested the interview, was advised of his right to remain silent, and chose to proceed with being interviewed despite being informed of his rights. Her entire interview with defendant was recorded and played for the jury.

*6. Defendant's Recorded Interview*

During his recorded interview, defendant indicated he was aware of the potential charges against him. Defendant initially stated he could not understand the sodomy allegations, but could understand why Jane Doe might believe oral copulation occurred. When the detective responded by saying, "So tell me about that then," defendant proceeded to accuse Jane Doe of asking him for sexual favors, acting out in sexual ways all the time, constantly referencing a pornography Web site in his presence, and threatening that defendant would go to jail. Defendant referenced an out-of-state family trip to Utah sometime in 2016 where Jane Doe became very sick and then noted following this trip he "had this, like, yearlong reprieve where she didn't bug me about anything."

Unprompted, defendant told the detectives that "you could t-uh, test my phone. You'll find her vaginal—I'm sure, on my phone. You'll find it on the TV remote. You'll find it on her hairbrush. You'll find it on, um—you'll find it on her mother's vibrator — maybe—probably—I'm sure of it." When asked to explain those statements, defendant stated, "It was just an object that she was using." Defendant stated he had witnessed Jane Doe use the television remote to masturbate herself at least half a dozen times.

When the detective asked defendant to focus back on his initial statements regarding how he could understand why Jane Doe might believe oral copulation occurred, defendant stated: "She started telling me to lick it and I finally figured out what it was that she was talkin' about. And I always told her, 'No . . . that's not how you make babies.' [¶] And she, um—she finally told me that she was gonna tell if I didn't

10

and—so she grabbed my hair and pulled me down on her and I got up and got out of there as quick as I could." In response to this statement, the detective asked defendant: "So at any point did you lick her vagina?" Defendant responded: "Um, I zerberted her—not her vagina but her—uh, what did I call it - her clitoris."[3] When the detective asked defendant to "[t]ell me everything about that incident from start to finish," defendant stated he had been high on pain killers and testosterone, had snuck away to an upstairs bedroom, was caught masturbating in the bedroom by Jane Doe, and was told by Jane Doe that he would go to jail.

Defendant stated that Jane Doe forced him to buy toys for her every other week; build her things that she wanted; and play "piggy toes" with her after she had gone to bed. When asked what sexual favors Jane Doe had asked him for, defendant stated Jane Doe wanted him to let her get away with masturbating with a massager, masturbating in the living room in front of the television, and following defendant around making sexual references. Defendant further stated that Jane Doe asked him to "rub it" while masturbating in front of him. He observed Jane Doe masturbating often while she tried to fall asleep.

The detective present during the interview followed up by asking defendant if he ever touched Jane Doe in response to her requests, to which defendant responded, "And you're gonna give me a count for each time. I don't know." The detective again asked, "Did you touch it?", to which defendant responded, "I already said, 'Yes.' " He then

---

[3] Defendant later explained that the term zerbert refers to the act of using his mouth to blow bubbles on Jane Doe's belly.

described how he would rub the back of Jane Doe's legs and her feet while she was sleepy and stated, "that's all that was going on." However, when again asked, "what did you do when you touched it for her? Where did you touch it? How was her body?", defendant responded, "Just through her underwear." Defendant stated, "Because if I . . . [¶] don't. She's going to her mother. She said she's telling me I'm going to jail. [¶] . . . [¶] Because it's still just I can't morally wrap my head around it. I know it's wrong." Later in the interview, defendant again asserted that "if I didn't let [Jane Doe] have my phone, if I didn't do what she said to do, she was going to her mother and I was going to jail." He recalled Jane Doe threatening him with jail every day for the past couple of weeks prior to his arrest. When asked if he believed Jane Doe's threat that he would go to jail, defendant stated, "I had no reason to not believe her."

*7. Defendant's Testimony*

Defendant testified on his own behalf. He denied ever inserting his penis in Jane Doe; denied ever placing his penis anywhere on her body; denied ever touching her vagina, using a massager on her vagina, or touching her with a sexual motive.

Regarding his prior statements during his interview, defendant explained that at the time he made those statements, he had not slept for days and had not had access to all his medications. With respect to his statement he had zerberted Jane Doe's clitoris, defendant explained that he was referring to an incident in which he attempted to zerbert Jane Doe's belly, but Jane Doe claimed he hit her private while attempting to do so and he simply wanted to acknowledge that claim.

12

Regarding his prior statement to his doctor, defendant admitted telling his doctor he had masturbated in front of Jane Doe, but claimed he was referring to an incident in which Jane Doe walked in on him while he was masturbating. Defendant stated that shortly prior to his arrest, Jane Doe had walked in on him while he was masturbating and watching pornography in the guest bedroom. He did not realize she had walked in until he had finished masturbating and, when he realized she was there he attempted to cover himself up, and zerberted Jane Doe's belly as a signal for her to leave. At the time of these statements, he did not know the full nature of the allegations being made against him by Jane Doe.

Defendant admitted that he treated Jane Doe differently from his other children, but explained that it was because he believed she had a rough start in life and was developmentally delayed.

Defendant stated that "tickle time" was a game he played with all of his children, although he acknowledged that his other children grew out of it around the age of four or five. Defendant claimed that the only time he may have touched Jane Doe's privates was during an incident in which Jane Doe became very ill while they were traveling out of state and she wrapped herself around his arm. He stated that Jane Doe was fully clothed during this incident and any touching would have been unintentional. Defendant also claimed that following this trip, Jane Doe began experiencing "a clear hard break from reality." He claimed Jane Doe would only eat food off of his plate, refused to stay in her own bed at night, stalled in her learning, and claimed to have met or interacted with deceased people. He believed Jane Doe had no boundary between reality and fantasy and

13

that in Jane Doe's mind, a zerbert to her belly constituted oral copulation. He believed Jane Doe tended to sexualize things because she was experiencing the onset of mental illness.

He acknowledged that prior to his arrest, he was having relationship difficulties with E.B. and had moved into a guest bedroom. He testified that following his arrest, E.B. sold many of the possessions he personally valued, he had to be taken to the hospital for potential heart issues, and did not believe he had been given his medications. As a result, he was not entirely accurate when answering police questions because he was having suicidal thoughts, suffered from extreme sleep deprivation, and severe physical pain at the time.

When asked to explain his prior statement to detectives that he zerberted Jane Doe's clitoris, defendant stated: "I—when that incident happened, I basically jumped off of the bed. I bent over to give her a zerbert on her belly. . . . And afterwards, she said that I hit her private. And at that point I don't really have any—I—I didn't remember anything of the sort. She said it, so I went with it. I just was taking responsibility for something that I didn't think I did, and I still don't think I did. [¶] . . . [¶] It wasn't something that I did. It was something that she said I did, and I don't have an argument. I don't—I—other than to say that it didn't happen."

When asked to explain his prior statement to detectives that what he did to Jane Doe was something he could not "morally wrap [his] head around," and acknowledgment that "I know it's wrong," defendant did not explain what actions he may have been

14

referring to, but simply stated he was stressed because the situation made a "big impact" on him.

When asked about a prior statement to detectives that the use of testosterone was "probably [his] only defense," defendant did not explain what he meant by that statement. Instead, defendant simply acknowledged his use of testosterone, attributed significant weight loss to its use, and stated his testosterone use did not give him sexual urges.

When confronted about his prior statement to police accusing Jane Doe of blackmailing him and asked to explain how he could allow a child to blackmail him, defendant answered: "I don't have an explanation. [¶] The behavior would come and go, and I'd always just pray that it was going to go, and it kept coming back. [¶] I—I was more worried about [E.B.], more worried about—I was preoccupied with my job." When pressed to explain how Jane Doe was blackmailing him, he stated he was referring to a time when Jane Doe caught him watching pornography and told him he would go to jail as a result. However, when further asked why he believed he could go to jail for watching pornography, defendant did not give an answer and instead stated he was stressed over all the family dynamics in the house at the time.

On cross-examination, defendant was asked to describe Jane Doe's physical posturing during tickle time. He described multiple scenarios including Jane Doe "lay[ing] over the top" of him while he tickled her. When asked follow up questions regarding where and how this occurred, defendant claimed he could not actually remember any such incident.

15

Defendant was also asked to explain why he appeared to treat Jane Doe differently than his other children by failing to discipline her. Defendant denied refraining from disciplining Jane Doe and claimed that he simply had a different approach to discipline. However, when asked what he would do as an alternative form of discipline, defendant stated, "I don't know."

Defendant was also given another opportunity during cross-examination to explain his claims that he was blackmailed by Jane Doe into performing sexual or other favors. The prosecutor asked, "Isn't it correct that earlier today when you were asked about being blackmailed by Jane Doe, you told the Court that you had no explanation for it?" Defendant again declined to give an explanation, stating only, "I can't reason it. I can't justify it. I can't wrap my head around it. I don't know what I was thinking. I—I should have—I should have nipped it in the bud from the very beginning. I should have never put myself in that situation."

*C. Verdict and Sentencing*

The jury returned verdicts finding defendant guilty on two counts of sexual penetration with a child age 10 or younger (§ 288.7, subd. (b), counts 1 & 6); two counts of oral copulation with a child age 10 or younger (§ 288.7, subd. (b), counts 2 & 15); six counts of lewd acts against a child under age 14 (§ 288, subd. (a), counts 4, 5, 8, 10, 12 & 14); one count of a forcible lewd act against a child under age 14 (§ 288, subd. (b)(1), count 13); and one count of showing pornography to a minor (§ 288.2, subd. (a)(2), count 3).

The jury was unable to reach a verdict on the charge of sexual intercourse with a child age 10 years or younger (§ 288.7, subd. (a), count 7); one of the lewd act charges (§ 288, subd. (a), count 9);[4] and one of the charges of oral copulation with a child 10 years of age or younger (§ 288.7, subd. (b), count 11); the trial court declared a mistrial as to these counts; and the prosecutor eventually requested dismissal of these counts.

The trial court sentenced defendant to consecutive terms of 15 years to life for each of the offenses involving sexual penetration and oral copulation (§288.7, subd. (b), counts 1, 2, 6 & 15); a consecutive term of eight years for the forcible lewd act conviction (§ 288, subd. (b)(1), count 13); a consecutive term of eight months on the conviction for showing harmful material to a minor (§ 288.2, subd. (a)(2), count 3); and consecutive two-year terms for each of the remaining convictions for lewd acts against a child (§ 288, subd. (a), counts 4, 5, 8, 10, 12 & 14), representing a total sentence of 20 years eight months plus an additional 60 years to life in state prison. Additionally, the trial court credited defendant's sentence with 337 days of presentence custody credit and imposed a $5,000 restitution fine; a $480 court operations assessment; and $360 in criminal conviction assessments.

---

[4] At the time of trial, count 9 was amended to conform to proof to allege a lesser related lewd act charge under section 288, subdivision (a).

## III. DISCUSSION

### A. *The Record Available Does Not Establish an Abuse of Discretion in the Trial Court's Pretrial Discovery Determination Regarding Jane Doe's Medical Records*

Prior to trial, defendant subpoenaed Jane Doe's medical records and requested the trial court conduct an in camera review to determine if those records contained any information that defendant could use in cross-examination. On September 20, 2018, the trial court granted the request, conducted an in camera review of these records; and concluded that none of the records would be relevant for cross-examination. The trial court notified the parties that it found nothing in the documents that fell into the categories requested by defendant and thereafter ordered the documents sealed, placed in the exhibit department at the court and not to be released absent further order of the trial court. Defendant requests this court conduct an independent review of the transcript of this in camera proceeding as well as the underlying documents to determine if the trial court erred in reaching this conclusion and the People do not oppose this request.

"[P]sychiatric material is generally undiscoverable prior to trial." (*People v. Gurule* (2002) 28 Cal.4th 557, 592.) " '[W]hen a defendant proposes to impeach a critical prosecution witness with questions that call for privileged information, the trial court may be called upon . . . to balance the defendant's need for cross-examination and the state policies the privilege is intended to serve.' [Citation.] In this context, the records should be disclosed if they are 'material.' [Citation.] ' " 'Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable

18

probability" is a probability sufficient to undermine confidence in the outcome.' " '
[Citation.]" (*People v. Abel* (2012) 53 Cal.4th 891, 931.) The trial court's ruling on a
discovery motion is subject to review for abuse of discretion. (*People v. Prince* (2007)
40 Cal.4th 1179, 1232.)

We have reviewed the sealed transcript of the trial court's in camera proceeding.
The transcript indicates the trial court properly conducted an in camera review,
identifying the nature of the documents reviewed and the trial court's conclusions
regarding why each document did not fall within the discoverable categories identified by
defendant in his request. Thus, this is not a situation in which the trial court failed to
make a record or otherwise failed to comply with its obligation to conduct a meaningful
review of the documents. The sealed transcript does not evidence an abuse of discretion
with respect to the manner in which the trial court conducted its review.

However, we are unable to independently review the underlying documents to determine if the trial court erred with respect to any of its conclusions. The underlying documents were not made part of the record on appeal and were not otherwise provided for our review. Such documents are not considered part of the normal record on appeal[5] and to the extent an appellant's claims require appellate review of such documents, it is appellant's burden to file an application with the superior court seeking an order to include these additional materials. (*People v. Rodriguez* (2011) 193 Cal.App.4th 360, 366; Cal. Rules of Court, rule 8.324.) Such an application must be filed with the notice of appeal or as soon thereafter as possible. (Cal. Rules of Court, rule 8.324(c).) Defendant's counsel did not make a timely application here and the failure to provide an adequate record on an issue requires that the issue be resolved against the appellant. (*People v. Accredited Surety & Casualty Co.* (2019) 34 Cal.App.5th 891, 900.) We acknowledge that defendant's counsel could reasonably expect these documents to be retained by the superior court during the pendency of this appeal, however, through no fault of counsel, the records are no longer available.[6]

Finally, even assuming the underlying documents had contained information of the type requested by defendant and assuming the trial court erred in failing to disclose

---

[5] Defense motions and supporting attachments are only considered part of the record if denied in whole or in part. (Cal. Rules of Court, rule 8.320(b)(13).) Here, the trial court *granted* defendant's request to conduct an in camera review. We note that in the analogous context of requests for in camera review of law enforcement personnel files, appellate courts recognize that where the trial court conducts an actual review, the underlying documents are not necessarily made part of the record on appeal absent a

that information, we conclude that defendant could not show resulting prejudice on the record before us.  Defendant specifically requested the trial court review and release any of Jane Doe's medical or psychiatric records which disclose "psychotic or hallucinatory behavior relevant to credibility" to assist with cross-examination.  Presumably, such records could be used to elicit testimony from Jane Doe suggesting she suffered a preexisting history of psychotic or hallucinatory behavior, which might suggest she lacked the ability to accurately recall or accurately perceive the events to which she testified.  However, during cross-examination, Jane Doe openly admitted she suffered hallucinatory visions and further conceded that these hallucinations may have occurred prior to her disclosure of abuse.  Thus, despite not having the documents at issue,

---

request to augment the record.  (*See People v. Myles* (2012) 53 Cal.4th 1181, 1209 [sealed transcript of in camera proceeding made available, but not underlying records].)

[6] While the responsibility to ensure transmittal of relevant exhibits belongs to the parties to an appeal (Cal. Rules of Court, rule 8.244(a)), as a matter of courtesy, this court routinely invites counsel to identify exhibits referenced in appellate briefs but not included in the clerk's transcript so that such exhibits can be requested directly by this court for the sake of judicial economy (rule 8.224(d)).  On February 27, 2020, in response to this solicitation, appellant's counsel identified the underlying sealed documents at issue.  (See notice filed February 27, 2020.)  However, when we directed the superior court to transmit these documents to us, we were notified that the documents had been destroyed on April 24, 2019.  (See affidavit of deputy clerk filed March 3, 2020.)  We note that the unavailability of these documents could have been avoided had a timely request for additional records been made by defendant pursuant to California Rules of Court, rule 8.324, or a motion to augment the record been made following completion of the appellate record in February 2019.  In any event, the documents appear unavailable to us for the purpose of conducting an independent review at this time.  For this same reason, we are unable to exercise our discretion to augment the record on appeal to include such documents for review.  (See *People v. Rodriguez*, *supra*, 193 Cal.App.4th at p. 366.)

21

defendant was able to obtain from Jane Doe the very testimony he believed these documents might help establish.  It does not appear any of Jane Doe's medical records were necessary to elicit the testimony defendant desired and we thus conclude that defendant could not have been prejudiced.

*B. The Trial Court Did Not Err in Instructing the Jury Regarding Defendant's Failure to Explain or Deny Evidence*

Defendant also contends the trial court erred in instructing the jury pursuant to CALCRIM No. 361, which provides:  "If the defendant failed in his testimony to explain or deny evidence against him, and if he could reasonably be expected to have done so based on what he knew, you may consider his failure to explain or deny in evaluating that evidence.  Any such failure is not enough by itself to prove guilt.  The People must still prove the defendant guilty beyond a reasonable doubt.  [¶]  If the defendant failed to explain or deny, it is up to you to decide the meaning and importance of that failure."  Specifically, defendant contends there was insufficient evidence to support giving this instruction.  We disagree.

"CALCRIM No. 361 rests on the logical inference that if a person charged with a crime is given the opportunity to explain or deny evidence against him or her but fails to do so, then that evidence may be entitled to added weight.  [Citation.]  The focus of the instruction 'as its language indicates, is not on the defendant's credibility as a witness, but on the role of a testifying defendant's failure to explain or deny incriminating evidence in how jurors "evaluat[e] that evidence," i.e., the evidence the defendant has failed to explain or deny.' [Citations.]  However . . . ' "[i]t is an elementary principle of

22

law that before a jury can be instructed that it may draw a particular inference, evidence must appear in the record which, if believed by the jury, will support the suggested inference." ' [Citation.]  Thus, CALCRIM No. 361 'is not to be given every time a defendant testifies.' [Citation.]" (*People v. Grandberry* (2019) 35 Cal.App.5th 599, 605-606.)

"[T]he task of the reviewing court in examining a claim that a CALCRIM No. 361-based jury instruction was improperly given is 'to ascertain if [the] defendant . . . failed to explain or deny any fact of evidence that was within the scope of relevant cross-examination' and was 'within [the defendant's] knowledge which he did not explain or deny.' [Citation.]" (*People v. Grandberry*, *supra*, 35 Cal.App.5th at p. 606.)  In doing so, we are mindful of the fact that "[t]he permissible scope of cross-examination of a defendant is generally broad.  'When a defendant voluntarily testifies, the district attorney may fully amplify his testimony by inquiring into the facts and circumstances surrounding his assertions, or by introducing evidence through cross-examination which explains or refutes his statements or the inferences which may necessarily be drawn from them.  [Citation.]  A defendant cannot, by testifying to a state of things contrary to and inconsistent with the evidence of the prosecution, thus indirectly denying the testimony against him, but without testifying expressly with relation to the same facts, limit the cross-examination to the precise facts concerning which he testifies." (*People v. Chatman* (2006) 38 Cal.4th 344, 382.)  CALCRIM No. 361 is therefore appropriately given "when a testifying defendant has failed to explain or deny matters within the scope

of relevant cross-examination, not simply those matters that were asked of the defendant on cross-examination." (*Grandberry*, at pp. 609-610.)

Additionally, "a defendant's claimed lack of knowledge of relevant facts or circumstances is not an explanation that renders the instruction inapplicable where it appears from the evidence that the defendant 'could reasonably be expected to know' those facts or circumstances." (*People v. Cortez* (2016) 63 Cal.4th 101, 119.) A defendant's claimed lack of knowledge is to be distinguished from situations in which the defendant "actually offers a denial or provides an explanation that may be characterized as incredible, unbelievable, or bizarre." (*Ibid.*) Thus, in *People v. Cortez*, our Supreme Court held the instruction was properly given where a testifying defendant previously provided detailed statements to police regarding a gang related shooting, but later claimed lack of knowledge of significant facts when testifying on the stand. (*Id.* at p. 122.)

Here, upon consideration of the entirety of the prosecution's evidence, the record clearly discloses several areas of inculpatory evidence that the defendant failed to deny or explain in his testimony. First, count 13 of the amended information charged defendant with lewd acts upon Jane Doe based upon forcibly kissing her. Jane Doe explicitly testified that on multiple occasions, defendant attempted to force her mouth open to kiss her and insert his tongue into her mouth. Defendant did not deny any of these physical acts and did not attempt to offer an alternative explanation or interpretation of these

physical acts.[7] In fact, defendant did not specifically address these factual allegations at all in his testimony, despite the allegations forming the basis of an independent charge against him.

Second, count 8 of the amended information charged defendant with lewd acts upon Jane Doe based upon touching her chest/breasts. L.B. testified that during tickle times he often witnessed defendant reach under Jane Doe's clothing to touch bare skin while Jane Doe was on defendant's lap. In cross-examination, defendant acknowledged he engaged in tickle time with Jane Doe and described a variety of situations in which that occurred, including with Jane Doe laying over his lap. However, when asked specifically to describe his physical contact with Jane Doe while she was laying on him, defendant claimed he could not recall any such instance.

Third, the investigating detective testified that the general behavior of sexual predators can involve grooming behaviors such as purchasing gifts and refraining from disciplining a child to build trust. Both E.B. and L.B. testified that defendant treated Jane Doe differently from his other children, including preventing any discipline of Jane Doe. Defendant challenged this characterization by stating that he simply had a different approach to discipline with Jane Doe. However, when asked to describe his approach, defendant stated, "I don't know."

---

[7] Defendant did offer a general statement that he never touched Jane Doe in a sexual manner. However, such a statement does not actually deny the physical acts Jane Doe alleged. Nor does the statement constitute an explanation by offering an alternative, non-sexual interpretation of the physical acts Jane Doe described in her testimony.

Finally, a recorded interview was played in which defendant accused Jane Doe of initiating sexual interaction with him and claimed that Jane Doe attempted to blackmail him by threatening defendant with going to jail if he did not comply with her demands for sexual favors. On cross-examination, defendant was asked to explain this claim and specifically asked why he felt threatened with jail time if he had done nothing wrong. Defendant never provided an answer, instead diverting the issue back to fear of retribution from E.B.

Each of these constitutes a clear example of inculpatory evidence presented in the prosecution's case in chief that the defendant either failed to deny or failed to explain in his testimony. Such matters were well within the scope of cross-examination and defendant's failure to address them or claimed lack of knowledge in response to questions regarding such matters supports giving the instruction set forth in CALCRIM No. 361. We therefore find no error in the giving of this instruction.

*C. Remand for an Ability to Pay Hearing is Unwarranted*

Defendant also argues that the trial court was required to conduct an ability to pay hearing prior to imposing monetary fines and fees pursuant to *People v. Dueñas*, *supra*, 30 Cal.App.5th 1157, 1160, and the matter must be remanded for the trial court to conduct such a hearing. Here, the trial court imposed a $5,000 restitution fine and $840 in court fees and assessments. We conclude that defendant has forfeited any challenge to the restitution fine by failing to preserve the issue below and further conclude that on this record, defendant has not established prejudice warranting remand regarding the remaining fees and assessments.

26

With respect to defendant's challenge to the $5,000 restitution fine under section 1202.4, defendant did not raise any challenge to the imposition of this fine based upon his inability to pay in the proceedings below. This court recently concluded in *People v. Taylor* (2019) 43 Cal.App.5th 390 that the failure to request an inability to pay hearing under almost identical circumstances forfeits the issue on appeal. (*Id.* at pp. 399-400.) As we explained in that case, the substantive law in effect even before *Dueñas*, provided the trial court with the ability to consider a defendant's inability to pay in assessing a restitution fine under section 1202.4 when considering any amount in excess of the statutory minimum. (*Taylor*, at p. 399.) Thus, the failure to object or request a hearing to determine ability to pay forfeits the issue on appeal where the court imposes a fine in excess of the statutory minimum. (*Id.* at pp. 399-400.) The $5,000 restitution fine is clearly in excess of the statutory minimum set forth in section 1202.4 and, as a result, we conclude defendant's claim that an ability to pay hearing was required has been forfeited.

With respect to the remaining fees and assessments in the amount of $840, the failure to conduct an ability to pay hearing with respect to these fees is considered error under *Dueñas*. (*People v. Dueñas*, *supra*, 30 Cal.App.5th at p. 1164.) However, error under *Dueñas* is not reversible per se, but instead subject to a harmless error analysis. (*People v. Jones* (2019) 36 Cal.App.5th 1028, 1034-1035.) Since an alleged error under *Dueñas* involves a violation of due process, we consider whether the error was harmless beyond a reasonable doubt. (*Ibid.;* see *Chapman v. California* (1967) 386 U.S. 18, 24.) "Because [] no ability to pay hearing was held, it is not defendant's burden on appeal to

establish his eligibility for relief.  Nevertheless, we will find *Dueñas* error harmless if the record demonstrated he cannot make such a showing." (*People v. Jones*, at p. 1035.)

The record contains ample evidence that defendant has the ability to pay the $840 of assessments and fees at issue here.  Defendant was 51 years of age at the time of sentencing; had worked continuously for the 18 years prior to his arrest; and earned in excess of $65,000 a year.  Defendant testified that only half of this income was required to pay his share of joint household and family expenses.  More importantly, defendant testified that upon his arrest, all his possessions were sold, including a Porsche, his home, and other personal belongings.  He specifically identified the value of some of these belongings, including a $14,000 metal detector and a $400 coin collection.[8]  Thus, even setting aside the potential to earn prison wages over the course of a significant prison term,[9] the suggestion that defendant does not have the ability to pay $840 in fees is untenable where the defendant himself has admitted ownership of assets with value significantly in excess of that amount.  We therefore conclude that any error with respect to the trial court's failure to conduct a hearing on defendant's ability to pay the $840 in fees and assessments was harmless and does not warrant remand.

---

[8]  While defendant testified E.B. facilitated the sale of these items, he explicitly identified the items as his and there is nothing in the record suggesting he has been denied access to his share of the proceeds.

[9]  See *People v. Jones*, *supra*, 36 Cal.App.5th at page 1035 [ability to earn prison wages "forecloses a meritorious inability to pay argument"], but contrast *People v. Taylor*, *supra*, 43 Cal.App.5th at page 402 [noting that prison wages are one point of consideration, but may not be dispositive in light of other factors].

28

*D. The Calculation Error in Custody Credits Should be Corrected*

Defendant contends and the people concede the trial court made a calculation error in awarding custody credits to defendant. We agree that the trial court's award of 295 days of actual custody credit and an additional 44 days of conduct credit should amount to a total of 339 days instead of the 337 days ultimately credited. We briefly note that "[t]he most expeditious and . . . appropriate method of correction of errors of this kind is to move for correction in the trial court." (*People v. Culpepper* (1994) 24 Cal.App.4th 1134, 1138.) Nevertheless, in the interests of justice and judicial economy, we shall order the trial court to correct the abstract of judgment to reflect the correct calculation of defendant's custody credits.

## IV. DISPOSITION

The trial court is ordered to correct the abstract of judgment to reflect an additional two days of presentence custody credit, for a total of 339 rather than 337 days. The court is further ordered to forward the amended abstract of judgment to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

FIELDS _____
J.

We concur:

MILLER _____
Acting P. J.

CODRINGTON _____
J.

29